ELIZA D. CARPENTER v. JOHN C. CARPENTER.

1. DIVORCE; *An Actual Resident under Sections 54 and 640 of Code.* The plaintiff was a lawyer; obtained a permanent and actual residence at Chanute, in Neosho county, Kansas; resided there for several years, and was then appointed collector of internal revenue of the United States for the district of Kansas. The office of such collector was required to be held at the city of Leavenworth, Leavenworth county, Kansas, and the duties of the office required the plaintiff's presence in Leavenworth city nearly all the time. The plaintiff went to Leavenworth and remained there for about five years, but at no time did he have any intention of changing his place of residence, but at all times considered Chanute his actual place of residence, and continued to vote there, and not at Leavenworth, and intended to return to Chanute whenever he should cease to hold his office. He was a single man, and boarded at Leavenworth with a family for about three or four years. He was then married to a woman who had never resided in Kansas, but whose home was in Pittsburgh, Pennsylvania. After his marriage, he and his wife boarded at Leavenworth for about seven or eight months, when the plaintiff rented a furnished house in the city of Leavenworth, and they kept house there for about seven weeks, when they separated, and the wife went back to her former home in Pittsburgh, Pennsylvania, and the plaintiff rented sleeping apartments in Leavenworth and again commenced to board. He continued to board at Leavenworth for about two months, when he commenced the present action in the district court of Neosho county, Kansas, to obtain a divorce from his wife on the ground of "extreme cruelty." *Held,* That the district court of Neosho county had jurisdiction to hear and determine the case; that the plaintiff was at the time of the commencement of this action "a resident" or "an actual resident" of Neosho county, Kansas, within the meaning of §§ 54 and 640 of the civil code; that these sections contemplate the actual and permanent residence of a party, and not merely the temporary and official residence which a party may adopt during the time of his holding a federal office.

2. JURY TRIAL — *Refusal, Not Error.* In the above-mentioned action the trial court refused to submit the case to a jury for trial, and tried the case itself; *held,* that this was correct, and was not, under the circumstances of the case, any abuse of judicial discretion.

3. ———— A large number of alleged errors mentioned in the opinion, and held not to be errors; and *further held*, that the findings of fact made by the trial court are amply sustained by the evidence.

4. EXTREME CRUELTY, *Facts Constituting*. It appears from the findings of the court and the evidence that the defendant, the plaintiff's wife, while they were residing in Leavenworth city, Kansas, among other wrongs prepared and sent anonymous letters to a clerk in the office of her husband, falsely charging that a criminal intimacy existed between her husband and the wife of such clerk; and also prepared and sent anonymous letters to the editors of newspapers at Leavenworth, making similar charges with the expectation that such charges would be published in the newspapers, and be made public; and also prepared and exhibited to another clerk of her husband another anonymous letter, containing similar charges. Her husband at the time was a member of a church, and professed to be an honest and faithful christian, and had high aspirations for political preferment. These charges not only tended to wound his feelings, and to destroy his peace and happinesss, and to impair his bodily health, but they were also naturally calculated to put his life in jeopardy; they were naturally calculated, if the clerk believed that they were true, and that a criminal intimacy existed between the plaintiff and the clerk's wife, to cause the clerk to take vengeance on the plaintiff. *Held*, That this conduct on the part of the plaintiff's wife constituted extreme "cruelty" within the meaning of the statutes authorizing the granting of divorces on the ground of extreme cruelty; and *further held*, that any unjustifiable conduct on the part of either the husband or the wife which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair the bodily health or endanger the life of the other, or such as in any other manner endangers the life of the other, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes "extreme cruelty" under the statutes, although no physical or personal violence may be inflicted, or even threatened.

*Error from Neosho District Court.*

ACTION by *John C. Carpenter* against *Eliza D. Carpenter*, for a divorce. The opinion states the facts. Judgment for plaintiff at the April Term, 1883. The defendant brings the case to this court.

*E. Stillings, William C. Hook,* and *L. Stillwell,* for plaintiff in error.

*Lucien Baker, Hutchings & Denison,* and *Goodin & Keplinger,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought by John C. Carpenter against Eliza D. Carpenter, his wife, in the district court of Neosho county, Kansas, to obtain a divorce on the ground of "extreme cruelty." The case was tried by the court without a jury, and the court found in favor of the plaintiff and against the defendant, and granted the divorce prayed for. The judgment was rendered April 16, 1883. To obtain a reversal of this judgment, the defendant, as plaintiff in error, now brings the case to this court. The first alleged ground for reversal is, that the district court had no jurisdiction of the subject-matter of the action; and this contention is predicated upon the provisions of §§ 54 and 640 of the civil code. The substance of these sections is, that the action for divorce is a local action, and can be brought only in the county of which the plaintiff is "a resident" or "an actual resident" at the time of filing the petition. The facts with reference to this subject, as found by the court below, are as follows:

"2. That plaintiff is a lawyer by profession; has heretofore, but not since the — day of March, 1878, been engaged in the practice thereof; that at or about that time he was appointed to and accepted the office of internal revenue collector of the United States for the district of Kansas; that at the time of such appointment he was practicing law, had his library, office, sleeping apartments, and washing done in Neosho county, Kansas; that he was the owner and in possession of both real and personal property located in the city of Chanute, in said county, which city was, at the time of his said appointment, within the geographical limits of Neosho county; that the plaintiff has ever since his said appointment voted in the county of Neosho, and at no other place; that he has claimed Neosho county as his residence for more than ten years last past, and now claims said county as his residence, and that he intended to return to said city of Chanute, in said county, where his professional library and office have for years last past been, just as soon as his official term of office should expire, and again resume the practice of the law; that the principal office to which plaintiff was appointed, and which he

accepted in 1878, is kept and maintained in the city and county of Leavenworth, in said state, by order of the government of the United States; that the same has been kept and maintained in said city and county of Leavenworth by reason of such order; that the plaintiff in the discharge of his official duties has been compelled to spend his time chiefly in said city of Leavenworth; that at the time of the commencement of this action he was occupying private sleeping apartments in said city of Leavenworth, and when not engaged in official or other business at other places, he boarded at some public house in said city; that the internal revenue district of the United States for the state of Kansas for which the plaintiff was appointed collector, comprises the whole state of Kansas."

From the foregoing facts the court deduced the following conclusion of law:

"2. That plaintiff for more than one year next preceding the filing of his petition herein was, and now is, a resident of the county of Neosho, and the state of Kansas."

The court also found that for more than sixteen years last past the plaintiff has been an actual resident in good faith of the state of Kansas.

Said sections 54 and 640 read as follows:

"SEC. 54. An action for a divorce may be brought in the county of which the plaintiff is an actual resident at the time of filing the petition."

"SEC. 640. The plaintiff in an action for divorce must have been an actual resident, in good faith, of the state for one year next preceding the filing of the petition, and a resident of the county in which the action is brought at the time the petition is filed."

We think the foregoing facts, as found by the court below, are sustained by the evidence. There are also one or two other facts which we might state in this connection: About November 1, 1882, the plaintiff, Carpenter, rented a furnished house in the city of Leavenworth, and from November 9, 1882, up to December 29, 1882, he, with his wife, and one or more servants, resided in such house and kept house. But his law library, with some other property, has all the time remained at Chanute.

The plaintiff in error, defendant below, first made her objection to the jurisdiction of the trial court by inserting such objection in her answer to the plaintiff's petition, which she filed in answer to the merits of the action. For this reason, the defendant in error, plaintiff below, claims that the defendant below waived all objection to the jurisdiction of the court, and cites *Meixell v. Kirkpatrick,* 29 Kas. 679, 683, and cases there cited. The defendant in error claims that the objection to the jurisdiction should have been made, if made at all, before any general appearance in the case was made, and before answering to the merits. On the other hand, the plaintiff in error, defendant below, claims that an objection to the jurisdiction of the court may be made at any time. (Civil Code, § 91.)

Assuming that the plaintiff in error is correct upon this proposition, but not intending to express any opinion thereon, we must say that we think that the decision of the court below upon the question of jurisdiction was, nevertheless, correct. Mr. Carpenter's permanent and actual residence was in Neosho county, while his temporary and transient residence was in Leavenworth county. He was simply a sojourner in the city of Leavenworth during the continuance of his term of office; and he never intended or expected to make that place his permanent home, but always intended and expected to return to Chanute, in Neosho county, when his term of office expired; and always intended and expected to continue to make that place his permanent home, his permanent abiding-place; and his wife, the defendant below, understood this as well as he did, for in her letter to him, written January 11, 1883, after their separation, she says:

"My position in P—— [Pittsburgh, Pa.] as the daughter of · C. H. Armstrong, in a large city, and among my old friends, was better than on a salary, in a government office, in a small town, and the possibility of losing it at any time and settling in Chanute. . . . I should have been just as happy in two rooms in Chanute as in forty rooms in Topeka, if you had been kind and affectionate towards me, and showed me you liked to be with me."

Carpenter obtained an absolute residence at Chanute. He left it temporarily to take possession of a federal office, the duties of which required his presence in Leavenworth. He boarded for a time in Leavenworth county. He married a wife who had never resided in any ·part of the state of Kansas. They then boarded for a time in Leavenworth, but afterward rented a furnished house and kept house for about seven weeks in Leavenworth; but Carpenter at all times considered Neosho county as his permanent home and abiding-place. Now we think that this permanent and absolute home of Carpenter in Neosho county, and not his temporary and official home in Leavenworth county, was his residence, or actual residence, within the meaning of ·the divorce statutes. (See Bishop on Marriage and Divorce, §§ 210 to 214; Wharton on the Conflict of Laws, §§ 50 to 56, and authorities cited in the brief of counsel for defendant in error, as follows: *Hinds v. Hinds*, 1 Iowa, 36; *Hayes v. Hayes*, 74 Ill. 312; *Hanson v. Hanson*, 111 Mass. 158; *Culbertson v. Floyd*, 52 Ind. 361; *Kennedy v. Ryall*, 67 N. Y. 379–386; *W. Iron Works v. Toy*, 12 Law An. 200.)

The words "resident" and "actual resident," as used in the divorce statutes, we think contemplate a residence and actual residence with substantially the same attributes as are intended when the word "domicile" is used. And we do not think that it makes any difference that the word "residence" sometimes or in some other statute, may mean something else. It may be that for the purpose of serving a summons, the words "usual place of residence" should be held to mean the place where the defendant is in fact residing for the time being; though, *contra*, see *Love v. Cherry*, 24 Iowa, 204. But we do not think that the words "resident" or "actual resident," as used in the divorce statutes, can have in contemplation any such kind of residence. In the divorce statutes, we think these words have in contemplation a residence of a more permanent and fixed character.

But counsel for plaintiff in error desire to make a distinction between official homes where the offices with which they

are connected have a fixed and definite term, and official homes where the offices with which they are connected are held simply during the pleasure of the appointing power, as the office of collector of internal revenue is. But we do not see any good reason for making any such distinction, and the great weight of authority we think is against any such distinction. But if any distinction is to be made, should it not be made in favor of the plaintiff below, and not against him? We would think that a person who is liable to be deprived of his office at any time would be less likely to desire to change his place of residence, and to obtain a new and fixed residence at the place of his official home, than a person who knew that his tenure of office was fixed and settled for some definite period of time. Ministers abroad often have residences in foreign countries without becoming foreigners, or losing their residence or citizenship in the states from which they were appointed. And we would suppose that if the present revenue district were to include western Missouri, and if the collector were required to hold his office in Kansas City, Missouri, the mere fact of his holding his office in Kansas City, and temporarily residing there, would not make him a resident of Missouri, and a non-resident of Kansas.

The next alleged ground for reversal is, that the court below erred in refusing to submit the case to a jury and in trying the case itself. Now there was certainly no error in this, for under the statutes of Kansas this class of cases must "be tried by the court, subject to its power to order any issue or issues to be tried by a jury, or referred, as provided in the code." (Civil Code, §§ 265, 266, 267.) And there is nothing in the present case tending to show any abuse of judicial discretion with respect to this matter. The only question that was to be tried in this case was, whether the plaintiff should be granted a divorce or not; he prayed for nothing else. And the defendant prayed for nothing except that "the plaintiff be not divorced from her." It is true as claimed by the plaintiff in error, defendant below, that the plaintiff and the judge of the trial court were once practicing lawyers of the

same judicial district, though not of the same county, one of them living in Allen county and the other in Neosho county. But neither of them had at the time of the trial been a practicing lawyer for several years, one of them having been judge of the district court for about eight years, and the other United States collector of internal revenue for about five years. But how can the fact that the judge was once a practicing lawyer in the same judicial district with the plaintiff disqualify the judge from hearing the case? For a construction of the civil code with reference to the right of a party to a trial by jury, see *City of Emporia v. Soden,* 25 Kas. 588; *Hixon v. George,* 18 id. 253, 256; *Carlin v. Donegan,* 15 id. 495.

There are several supposed errors, which are alleged to have occurred at the trial of this case, which we hardly think are of sufficient importance to require any consideration:

1. It is claimed that the court below erred in refusing to permit the defendant below to prove why she visited A. G. Carpenter, at Olathe, Kansas. Now this was an immaterial matter. Besides, the court did permit her to prove it, but simply refused to permit her to prove that Mrs. Elizabeth Elliott, a sister of the plaintiff, advised the defendant, while both were in Pennsylvania, and the plaintiff in Kansas, to make such visit.

2. It is claimed that the court below erred in refusing to permit the defendant below to introduce evidence showing her good character in Pennsylvania. The plaintiff below admitted that her character and standing in Pennsylvania were good, and that he made no attack upon her character.

3. It is also claimed that the court below erred in refusing to permit the defendant below to show her financial condition. Now there was nothing in the pleadings, nor in any of the other proceedings, that authorized such a showing. She claimed neither alimony nor suit-money, and made no pretense that she was not amply able financially to take care of herself and of her case.

4. The plaintiff in error, defendant below, also claims that

the court below erred in refusing to permit certain questions to be asked A. G. Carpenter on cross-examination. Now the matter attempted to be elicited by these questions was simply hearsay evidence, and not proper cross-examination.

5. It is also claimed that the court below erred in excluding the evidence of Maggie Armstrong, a sister of Mrs. Carpenter, as to what Mrs. Carpenter told her mother on her return to Pittsburgh, Pennsylvania; or, rather, what she did not tell her mother at such time and place. Her husband, the plaintiff below, was then in Kansas.

6. It is also claimed that the court below erred in refusing to compel the plaintiff below to produce a certain diary written by his wife, and two certain letters written by her from Pittsburgh, Pennsylvania, to him at Leavenworth, Kansas, after their separation. This diary and these letters were afterward introduced in evidence by the parties.

7. It is also claimed that the court below erred in refusing to make certain special findings. The defendant below, by her counsel, presented to the court twenty-two different questions which she asked the court to answer; but the court below refused to answer any of them in the form in which they were presented to it, but made special findings of its own, as hereinafter set forth. We think that the court below made all the special findings that the pleadings and the evidence called for, or that were necessary in the case; and the court answered in substance all the questions of any materiality presented to it by the defendant. At the present time the plaintiff in error, defendant below, does not insist that the court below erred with respect to any of these questions, except with respect to two of them, as follows: *First,* When did the plaintiff below first form and express his determination to separate from his wife? *Second,* What was the purpose and the object of the defendant below in sending the anonymous letters hereafter mentioned? We think these matters were sufficiently found in the more general findings of the court; but we shall have more to say with respect to them hereafter.

8. It is also claimed that the findings of the court below with respect to the conduct of the parties, and other matters, are not sustained by sufficient evidence.

The findings of the court below are as follows:

"1. That plaintiff and defendant were married in the city of Pittsburgh, in the state of Pennsylvania, on the 2d day of March, 1882.

"2. [The second finding has already been given.]

"3. That the plaintiff conducted himself toward the defendant as a kind, faithful and affectionate husband from their marriage until their separation.

"4. That during the month of December, 1882, the defendant made, composed and sent through the post office of said city of Leavenworth certain anonymous communications concerning her husband, the plaintiff, accusing and charging him with being guilty of adultery and other wrongs with the wife of one of the employés of his office; that for the purpose of having it made publicly to be believed that the plaintiff was guilty of such crimes and wrongs, sent one of such communications, for the purpose of publication therein, to each of two leading newspapers, viz., the Leavenworth *Daily Standard*, and the Leavenworth *Daily Times;* that two of such communications were sent to the said employé, in said office of plaintiff, and that one addressed to herself, the defendant, was sent to plaintiff's office, and there intercepted by him.

"5. That defendant knew that the charges made in said communications were wholly false, untrue, and without foundation; that she did not believe said charges to be true, and had no reason to so believe; that the said communications were made, composed and sent for the purpose, among others, of destroying the friendship which had for a long time existed between the plaintiff and the family of said employé, caused by numerous acts of kindness by the latter toward the former during a severe illness, and which was brought to the knowledge of defendant before marriage with plaintiff, and that there had been no illicit or criminal intercourse between the said plaintiff and the wife of said employé.

"6. That on account of the acts of the said defendant, and the publicity given thereto by her own conduct, the plaintiff became broken and severely injured in health, depressed in spirits, and sorely troubled and injured in mind and body.

"7. That the plaintiff, becoming satisfied that the defendant was the author of the anonymous communications referred to

46—30 KAS.

in the fourth finding of facts herein, did, on the 27th day of December, 1882, accuse the defendant of composing and sending the same, and thereupon it was mutually agreed between plaintiff and defendant to separate, that they could not live together any longer, and plaintiff and defendant then and there agreed upon a settlement and division of all property between them, and settled such matter, the defendant executing deeds to plaintiff's real estate, and the plaintiff executing a power of attorney for the defendant, thereby enabling defendant to control her own property; and afterward, and on the 29th day of December, 1882, the defendant left Leavenworth, Kansas, for Pittsburgh, Pennsylvania, and the plaintiff and the defendant have not lived together as husband and wife since said 27th day of December, 1882.

"8. That by reason of the conduct of the defendant, as hereinbefore found, the affections of the parties have become alienated, their happiness destroyed, and the legitimate ends of matrimony have not and cannot be reached and realized.

"9. That all and singular the several matters and things in the plaintiff's petition averred of and concerning the defendant are and were at the commencement of this suit true."

As conclusions of law the court found:

"1. That for more than sixteen years last past plaintiff has been an actual resident, in good faith, in the state of Kansas.

"2. That plaintiff for more than one year next preceding the filing of his petition herein was, and now is, a resident of the county of Neosho and the state of Kansas.

"3. That plaintiff is entitled to a divorce from the defendant on account of her faults and aggressions, in that the defendant was guilty of extreme cruelty toward the plaintiff, as alleged in his petition."

We think the findings of fact as made by the court below are not only sustained by sufficient evidence to preclude their being set aside in this court, (*Gibbs v. Gibbs*, 18 Kas. 419,) but they are sustained by an unquestionable preponderance of the evidence. We think there was abundant evidence to prove "that plaintiff [below] conducted himself toward the defendant as a kind, faithful and affectionate husband, from their marriage until their separation;" and that the plaintiff below did not form any intention to separate from his wife until after he had good reason to believe that she was the author

of the anonymous letters mentioned in the foregoing findings of fact; and we also think there was an abundance of evidence to prove that the defendant below was the author of said anonymous letters; and that she did not conduct herself toward the plaintiff below as as a kind, faithful and affectionate wife. And we do not think that it is material what her purpose or object was, in fact, when she originated, prepared and sent those anonymous letters, as found by the court below. Her object in sending them was not disclosed at the time to anyone, but the object could not have been a good one, and could not, under any circumstances, be justifiable. A portion of the evidence tended to show that she prepared and sent them for the purpose of destroying the friendship that existed between her husband and the Mitchell family; but even if this were the object, it would be wholly unjustifiable. We must decide the case, however, upon the theory that her object in preparing and sending these anonymous letters was just what would be the natural and probable result of preparing and sending such letters. We must decide the case upon the theory that she intended the natural and probable consequences of her own acts. We think all the material facts as found by the court below are amply sustained by the evidence.

The defendant herself, while testifying as a witness on the trial, admitted that she did not believe that the defendant was ever guilty of adultery with Mrs. Mitchell; and she also admitted that she "did not believe that he was guilty of criminal intimacy with anyone." She testified on the trial, among other things, as follows: .

"Q. You said on several occasions that you did not believe that Col. Carpenter ever had any criminal intercourse with Mrs. Mitchell? A. I did.

"Q. At the time that you filed that answer did you believe that Col. Carpenter ever did have any criminal intimacy with Mrs. Mitchell? A. No, sir; I did not."

She also testified, among other things, as follows:

"Q. State whether anything unpleasant occurred between

you and your husband while you were boarding with the Mitchells.   A. Nothing of an unpleasant character occurred between my husband and me while I boarded at the Mitchell house.

"Q. I understand you to say that during the time you lived there, you and your husband, with the Mitchells, you had no quarrel or difficulty with him?   A. I had no quarrel, that I could call a quarrel, with Col. Carpenter.

"Q. Up to the time that you went to Colorado [they left Leavenworth for Colorado on July 15, 1882], he always treated you with respect?   A. Yes, sir.

"Q. And you did him the same?   A. I tried to.

"Q. Up to the time that you went to Colorado, you did not know of any fault in Col. Carpenter; and in Colorado you had another interview in which the Mitchells were questioned?   A. Yes, sir.

"Q. Up to that time [the time when they returned from Colorado, in August, 1882], you have no serious charges against Col. Carpenter?   A. I never did have any.

"Q. Did you see this answer that is in this case?   A. Yes, sir.

"Q. You swore to it?   A. Yes, sir.

"Q. You never had any serious charges against him, you say?   A. No, sir."

Shortly after their return from Colorado, which was in August, 1882, Mrs. Carpenter returned to her former home in Pittsburgh, Pa.   This was about August 26, 1882.   From the testimony of Col. Carpenter and the letters received by him from her during her stay in Pittsburgh, Pa., this visit of hers was satisfactory to both parties.   She went to Pennsylvania partly because it was unsatisfactory to her to remain longer at Mr. Mitchell's house, partly because her mother was sick, and partly because she was herself diseased, and went to Pennsylvania for the purpose of medical treatment.   In her letter to Col. Carpenter of September 1, 1882, she says, among other things:

"It almost repaid me for coming, to see how pleased mother was at my being home once again.   . . .   I found mother much better than I expected.   Maggie says she began to be so from Saturday evening.   . . .   Mother thinks you are very good to let me come home at this time, and told me to

be sure and let you know that they all appreciate your kindness; and I know they hope to merit your respect."

In her letter of October 4, 1882, she says, among other things:

"Your letter Monday has done me lots of good. . . . Let me know what you think about my remaining longer, as I told you in my letter."

In her letter of October 17, 1882, she says, among other things:

"I do not see the necessity for you being here. For some reasons Dr. S. would rather not have you at present, and told me some things that I am to tell you when I see you. . . . As for your coming to meet me, I do not think the expense, etc., is necessary, as you will be busy enough getting the house in order. . . . Should the doctor desire me to remain longer, I shall of course let you know at once; but I think it will be unnecessary."

In her letter of October 21, 1882, she says, among other things:

"Your kind letter this morning makes me better prepared to endure it, [a surgical operation,] as you speak so encouragingly about our being together again. . . . However, I can better tell by October 29, when the final one [surgical operation] will positively be. . . . Unless you get a pass and really desire to come to Chicago, I do not see the necessity of your doing so, as much as I should like to see you. . . . I would rather you would look after the house, [a house that Colonel Carpenter had recently rented for them to live in,] getting everything moved out of your present quarters, [the Mitchell house,] and having the home we are to occupy this winter in readiness. However, I leave it in your hands; only do not think you are obliged to come, as I know you are perfectly willing to do so if necessary."

The letters of Colonel Carpenter to his wife, during the time that she was in Pennsylvania, she did not see fit to introduce in evidence, and they were not introduced in evidence, and consequently we do not know what their contents were, further than what her letters to him would indicate.

On November 7, 1882, she left Pittsburgh, and arrived at

Leavenworth on November 9, and they immediately went to the house which Colonel Carpenter had rented for them to live in. This house belonged to Mr. McKay, and was known as the "McKay house." It was large, commodious, and elegantly furnished. The defendant, in her testimony on the trial, states, among other things with reference to this house, as follows:

"*Question:* That was a furnished house? *Answer:* Yes, sir; it was furnished, and a very pleasant, large and roomy house.

"Q. That was a large and commodious house? A. Yes, sir.

"Q. It was fitted up in every respect? A. It was, with the exception of bed linen and table linen and dishes.

"Q. There was a superabundance of every kind of furniture there? A. It was sufficient.

"Q. You did not find any fault with Colonel Carpenter on account of failing to furnish anything? A. I did not.

"Q. You have stated that the house was fitted up with a superabundance of furniture? A. Yes, sir.

"Q. And he furnished everything that was necessary? A. Yes, sir.

"Q. Are those charges here in the answer [the defendant's answer to the plaintiff's petition] also correct? A. I did not say that.

"Q. It was well fitted up with costly furniture, and you brought your furniture there and commenced housekeeping? A. Yes, sir, he did.

"Q. Was there anything that ought to have been purchased there that was not purchased? A. No, sir; I don't think there was.

"Q. Did you ever ask him to buy anything that he refused to buy? A. No, sir.

"Q. Can you state anything more that he could have done to make that McKay house comfortable and fit it up for a house? A. I had nothing to complain of."

On the next Sunday after her return to Leavenworth, which was November 12, 1882, the plaintiff and defendant went to church together, and at the door of the church they met a little girl eight or ten years old, named "Ada Mitchell," who was the daughter of Mr. and Mrs. Mitchell, the persons with whom Col. Carpenter had made his home for several years,

and the persons with whom they both had boarded during the spring and summer of 1882, while Mrs. Carpenter was in Leavenworth. Col. Carpenter spoke to the little girl, but Mrs. Carpenter refused to do so. Mrs. Carpenter, whom Col. Carpenter called "Lyde," testified on the trial, among other things, that Col. Carpenter "turned round and said, 'Lyde,' that is little Ada; ain't you going to speak to little Ada?" And I said, 'Certainly I am not.' And then he turned around and went home, and I ran after him." They went home together. They had some sharp words with respect to this matter; and this came the nearest being a quarrel of anything that ever happened between them. But no one can read even Mrs. Carpenter's version of it, as she stated the same on the trial, without believing that Mrs. Carpenter was more to blame than Mr. Carpenter. Her testimony at the trial presented the matter in a very different light from her statement of the same in her diary, which was also introduced in evidence. Col. Carpenter may have been a little rude, but his conduct was certainly not sufficient to prevent him from obtaining a divorce, at least where the grounds for the divorce occurred afterward. From this time on the parties do not seem to have lived as happily together as husband and wife should. Mrs. Carpenter continued writing in her diary, stating many things which were not favorable to Col. Carpenter's character, and many things which were not strictly true; the theory of counsel for the plaintiff being, that these things were written for Col. Carpenter to see.

From about the last of November up to about the 19th of December, 1882, Mrs. Carpenter, according to her own testimony, received three anonymous letters; but it does not appear that anyone ever saw any of these letters except Mr. H. Feagan and herself, and Mr. Feagan saw only one of them. Mr. Feagan was Col. Carpenter's chief clerk in the revenue office. These letters were all derogatory to the character of Col. Carpenter. One of them she copied in the diary of December 13. On December 9, 1882, Col. Carpenter received an anonymous letter addressed to his wife; and

on December 12, he received another anonymous letter addressed to one of his clerks, Mr. J. N. Mitchell, the person with whom he had formerly lived. About this time anonymous letters were also sent to the editor of the Leavenworth *Daily Times* and the editor of the Leavenworth *Daily Standard*. Col. Carpenter suspected that his wife was the author of all these anonymous letters. Hereafter we shall give their contents, and comment more fully upon them; but for the present, we shall assume that his wife was the author of them, and that they furnished to Carpenter sufficient ground for a divorce. Col. Carpenter continued to live with his wife up to December 27, when, he states, she admitted that she was the author of the anonymous letters. During all this time he treated her kindly, but probably showed that his love for her was almost eradicated. On December 27, 1882, they separated; and on December 29, 1882, as before stated, Mrs. Carpenter went back to her former home at Pittsburgh, Pennsylvania.

It is now claimed by the plaintiff in error, defendant below, that Col. Carpenter formed the intention of dissolving the marriage relation existing between himself and wife prior to the reception or any knowledge of these anonymous letters; and really the only ground upon which she bases this claim is the testimony of Mrs. Anna R. Ridenour. Mrs. Ridenour at first stated in her testimony that Col. Carpenter at one time stated to her that he and his wife would have to separate; and then the following evidence was given by Mrs. Ridenour:

"Q. When did he say they would have to separate? A. I don't remember the time, but it does not seem a great while before they did separate.

"Q. Was it previous to December last? A. Yes, sir.

"Q. Was it previous to the time that Mrs. Carpenter returned from Pittsburgh and they went to housekeeping? A. Yes, sir, it was previous."

Afterward she appeared and corrected this testimony, by saying that the conversation between herself and Col. Carpenter, instead of being before December, was before Christ-

mas; and instead of being before housekeeping, was afterward; and in explanation she further said that she had been summoned hastily, that she had never been in a court room before, that when she gave her evidence she had not had time to think the matter over, and therefore that she had made the erroneous statements. Mrs. Ridenour had had many conversations with Col. Carpenter prior to Christmas and prior to December, and prior even to the year 1882; and it was therefore difficult for her to immediately remember when any particular conversation occurred. The plaintiff in error, defendant below, founds her claim that Col. Carpenter said prior to his receiving any knowledge concerning these anonymous letters, that he and his wife must separate, upon the theory that Mrs. Ridenour was not mistaken when she first gave her testimony, and that she afterward committed willful and corrupt perjury when she corrected the same. We think the corrected testimony of Mrs. Ridenour ought to be believed; and believing such testimony, then there is no evidence that tends to prove that Col. Carpenter had ever formed any intention of separating from his wife until after he had knowledge of these anonymous letters and after he had strong reasons to suspect that his wife was the author of them. This corresponds with his testimony. After he had received knowledge of these anonymous letters, and supposed that he had reason to suspect that his wife was the author of them, he then consulted with a few friends, including Mrs. Ridenour, who was a friend to both himself and his wife, as to what he should do. But according to his testimony he never spoke of separation to any person until after he had knowledge of these anonymous letters and until he believed that his wife was the author of them. He had no sufficient evidence, however, to prove that his wife was the author of them, until December 27, 1882, when she admitted, as he says, that she was the author of them. She however denies that she admitted any such thing. Now we do not think that what Col. Carpenter said to Mrs. Ridenour, or to any one else, about separating from his wife, is sufficient to prevent his

obtaining the divorce, provided his wife was the author of these anonymous letters, and provided they were sufficient to authorize a divorce. We think the finding of the court below upon this subject and with reference to Col. Carpenter's conduct toward his wife, and as a faithful and affectionate husband, is sustained by sufficient evidence.

The next question in the case is whether there was sufficient evidence to prove that Mrs. Carpenter was the author of these anonymous letters. Mrs. Carpenter hated the entire Mitchell family, and she hated Mrs. Mitchell with a hatred scarcely conceivable. She believed that the Mitchells were attempting to alienate the affections of her husband from herself; and she was therefore cruel and relentless in her hatred toward them. In her diary of Sunday, November 12, she uses the following language:

"SUNDAY.—My God, what a day have I put in! Insulted, vilified, scolded, raved at, called a liar and a hypocrite by the man who only eight short months ago swore to love, honor and cherish me. Can such things be, and I yet live? Father, is not suicide excusable under such circumstances? What would my mother, sister and brother think of the man whom they honor and love as the husband of their sister? And yet I cannot hate him. I think he is under the influence of those Mitchells—is so wrapped up in them he cannot be just or true to anyone who does not glorify them as he does. I would I had never married him, if this is to be the upshot of my ideal life with him. How long will it last? How will it end? Dear Saviour, guide and direct me through these most trying hours of our lives. Had I been the vilest, lowest outcast, I could not have been slandered worse; and yet my *husband* talks of a forgiving spirit, a loving heart. My grief is more than I can bear."

On December 13, 1882, Mrs. Carpenter wrote the following in her diary:

"A week ago yesterday morning when I went to look for the *Journal* found a law report for Mr. McKay, and an envelope directed to me, and oh! my God, on opening it I found an anonymous letter telling me that my husband was false to me, and directed to Ottawa street, between Second and Third. It was: 'Mrs. Carpenter, is your husband the

official who has his lover's husband in his office and who is to be written up in the Leavenworth *Times?'* What an agony I endured! I was nearly frantic, and concluded to wait further developments. Mr. Feagan was here on Friday and said *that woman* was in the office that afternoon, she could leave her sick husband and go down to see *mine,* but he was at home, fortunately."

Mrs. Carpenter, according to her testimony and as before stated, received three anonymous letters, with respect to which we shall have more to say hereafter.

On December 10, 1882, Col. Carpenter received at his office, and through the Leavenworth post office, a letter mailed December 9th, and addressed to "Mrs. Col. J. C. Carpenter, Leavenworth, Kansas." This address was made up of letters cut from some printed paper, and pasted on the envelope. On account of the peculiarity of the address, Col. Carpenter opened the letter. It reads as follows:

"Mrs. Carpenter: Is it your husband I hear is the official who has his lover's husband in his office, and that the Leavenworth *Times* is to write up? He would have wrote Col. John in his correct color not long since, only he got married, and that hindered it. Keep your eyes and ears open, and your attention will be paid for your time. I will write you again."

This letter he put away in his safe and said nothing about it. On December 12, Col. Carpenter received at his office another letter which came through the Leavenworth post office, addressed to "J. N. Mitchell, Leavenworth, Kansas." The address on this letter was made up in the same manner as the one addressed to Mrs. Carpenter; and Mitchell not being in the office at the time, Carpenter opened it. It reads as follows:

"Are you the man who is working for your wife's paramour, and it will be in the Leavenworth *Times.*"

Col. Carpenter put this letter away with the other. About December 19, 1882, anonymous letters of the same character were received by the editors of the Leavenworth *Daily Stand-*

*ard* and the Leavenworth *Daily Times.* The letter to the editor of the *Daily Standard* reads as follows:

"EDITOR STANDARD: Who is the official who has his woman's husband in his office for years? Does his wife, a highly accomplished lady, know of his weak, foolish admiration? More again."

The letter to the editor of the *Daily Times* was destroyed and no copy of the same was kept. On December 21, 1882, Mr. Mitchell received another anonymous letter addressed to himself, which letter he handed to Col. Carpenter and Carpenter placed it along with the others. The letter reads as follows:

"How does your old woman get along without Carpenter to ride her now? Are they at their old bed-ridden actions without your knowing it?"

All these letters, those addressed to Mrs. Carpenter, those addressed to Mr. Mitchell, and those addressed to the editors of the Leavenworth *Daily Times* and the Leavenworth *Daily Standard,* were made up of words and letters cut from some printed paper and pasted on a piece of white paper; and the addresses were all made up in the same way. The original letters above quoted were introduced in evidence on the trial. Jennie Gwinn, who was a servant girl at the house of Col. Carpenter and his wife, testified that she at one time mailed a letter for Mrs. Carpenter that had printed letters cut from some paper pasted on the envelope. That letter, however, which Jennie Gwinn mailed was in all probability not one of these anonymous letters.

The last anonymous letter which Mrs. Carpenter received, and which Mr. H. Feagan, the chief clerk in Col. Carpenter's office, read on December 20, 1882, was received on that day, or the day before. This letter was with reference to Col. Carpenter and Mrs. Mitchell, and was in substance very much like the second letter addressed to Mr. Mitchell, though it contained more than that letter. It contained the word "ride," or "riding," the same as that did. Mrs. Carpenter

testified upon cross-examination at the trial with respect to such letter and other matters, among other things, as follows:

*Question:* That letter referred to some official, which you understood referred to your husband? ` *Answer:* I cannot tell you how it was worded; indeed I cannot, but it was worded something in that way.

Q. It spoke of your husband? A. Yes, sir.

Q. It spoke of being written up in the Leavenworth *Times?* A. Yes, sir.

Q. And you understood that it was for your husband? A. Yes, sir.

Q. You knew that if your husband was written up in the Leavenworth *Times,* it would defame and injure him. A. Yes, sir.

Q. And you never said a word to him about it? A. No, sir.

Q. From the latter part of November to the 20th of December, you received one letter at least that informed you that your husband's reputation was to be attacked in the newspapers, and you never said a word to him? A. Yes, sir.

Q. You loved him? A. Yes, sir.

Q. You were interested in his character? A. Yes, sir.

Q. You knew it would ruin his character? A. Yes, sir.

Q. While he was standing right upon that abyss, you never said a word about it? A. Because I looked upon anonymous letters as very base.

Q. Was not that the very best reason why you should hasten to him, and let him know? A. Perhaps it would have been the best for me.

Q. You knew it would ruin him, and yet you kept perfectly still? A. Yes, sir.

Q. You got a second letter, did you? A. Yes, sir; I got a second letter.

Q. Did that letter refer to your husband's reputation? A. Not in the papers; it was a very obscene letter, and I burned it right away.

Q. Was that letter of such a character that you do not desire to give us the contents of it? A. I could not give the contents of it; but it was very obscene indeed.

Q. You thought it was an insult? A. It was a very great one.

Q. Could you think of anything greater? A. No; unless my husband should do something to me.

Q. You knew that your husband was the person mentioned? A. Yes, sir.

Q. And you put it in the fire and burned it? A. Yes, sir.

Q. And never said a word about it? A. No, sir.

Q. And you got a third letter? A. Yes, sir.

[This third letter is the letter which Mr. Feagan saw and read.]

Q. And that was a very obscene letter, too? A. Yes, sir; it was a very obscene one.

Q. At the time that you received this very obscene letter, how well were you acquainted with Mr. Feagan? A. I knew him very well; he had been at the house sometimes, and I had been at the office sometimes.

Q. You did not consider him very intimate? A. No, sir.

[Mrs. Carpenter then, in answer to a large number of questions, stated in substance that she construed the word "ride" or "riding" in the letter to mean the same as *drive* or *driving;* and that at first she did not think that the letter was so obscene as it in fact was.]

Q. You say your acquaintance with Mr. Feagan was not very extensive? A. No, sir.

Q. You wouldn't have shown him that letter if you had known the nature of that obscene language? A. I never would have shown any man, not even my own brother, if I had known it.

Q. When you sent for Feagan you didn't have the letter? A. I did not when I wrote for him to come; and when the girl went out of the door I had lit the grate in the back part of the house, and she handed me the letter.

Q. Just think about it now. Didn't you think it was very strange that you sent for Mr. Feagan? A. I did not think it was strange; but I think it was only too bad that I did not tell my husband about it.

Q. Feagan came up there, and you told him that you were having difficulties? A. I told him about this letter, and that there was something wrong about Colonel; and I wanted to know if I had better tell him about those letters; and if Colonel got any. I said: "I wonder if Colonel got any up at the office?" And he said he didn't know; and I said: "Mr. Feagan, ought I to tell Colonel about these letters?" And he said —

Q. Now, from their contents you think it was strange that you should tell or exhibit to a stranger what you should have told your husband? A. He was not a stranger. Colonel

respected him; and I thought I would ask him. I didn't know where to go; I didn't know anybody to go to.

Q. You had relatives there? A. They were not satisfactory to my husband, and I never went there.

Q. Do you know any more particular person or any more proper person for a wife to go to than her husband? A. I acknowledge that I made a very great error.

Q. When Feagan went away you requested him to give up the note that you had sent down to him? A. Yes, sir; and I requested him to please not tell Colonel anything about it. I had rather he did not know it then; and he said he thought he had better tell him. I said if anybody told him I would rather tell him myself; and as he went to leave he said: "Mrs. Carpenter, I would like to help you. I am a friend to Col. Carpenter." And I said: "No." I only wanted his advice. I looked upon these documents as most scurrilous and scandalous.

Q. When you sent up for Feagan, you wrote in the note "Please return the note?" A. Yes, sir.

Q. He had been there to see you, and he should not speak to the Colonel? A. Yes, sir; because I did not want that he tell the Colonel.

Q. You asked if Colonel did not receive any? A. Yes, sir, I did.

Q. You really wanted to know? A. Yes, sir, I did.

Q. Did you have any reason to believe that he had received any? A. I didn't know why anybody should send any of them to me, and not to him.

Q. It would have been a good deal easier to have just asked him, would it not? A. It was a very grave error, and a great mistake.

Q. Didn't he say "Mrs. Carpenter, I think I ought to tell Colonel that I have been here"? A. I do not recollect that he did.

Q. Did you not understand that you had placed Mr. Feagan in a very delicate situation? A. I think it was a very great mistake.

Q. Were there any postage stamps on those letters, those anonymous letters — on the envelopes that the anonymous letters came in? A. To me?

Q. Yes? A. There were, all three of them.

Q. Were they all three of them postmarked? A. I don't know; I didn't observe.

Q. Why did you observe them to be stamped and not post-

marked? A. All the letters had stamps on them, but I never noticed about the postmarks.

Q. And yet you were anxious to know where it came from, and you were at a great loss to know where it came from? A. Yes, sir.

Q. And never looked to see whether they were postmarked or not? A. I never did.

Q. You were aware at the time that the letters were usually postmarked? A. Yes, sir; they usually were."

[At one time, and some years before Col. Carpenter and Mrs. Carpenter were married, and while Mrs. Carpenter resided at Pittsburgh, Pa., and Col. Carpenter at Chanute, Kansas, Mrs Carpenter sent several anonymous communications to him. They were first, however, sent by her to friends of hers at different post offices, to be there addressed and mailed to Col. Carpenter. The next two questions have reference to these anonymous comunications sent by Mrs. Carpenter to Col. Carpenter before they were married.]

Q. When you sent those anonymous letters to Col. Carpenter, did you not send them to other post offices than one? A. It was at the suggestion of the other lady, so as to mystify him.

Q. By all coming from different places? A. Yes, sir.

Q. You burned up the first two [of those anonymous letters received in November and December, 1882]? A. Yes, sir, and I also burned the third letter.

Q. What did you burn them for? A. Because I did not want to keep them. The second one I didn't want in the house for two hours, and I burned it up immediately; it was so obscene.

Q. Did you keep a copy of them, or anything of that kind? A. I don't know; but I think I made mention of the first one in my diary. I do not know that I copied it there though.

Q. Why did you copy it in your diary and not keep the original? A. Because I did not think anybody would see my diary but myself, and the original might be seen.

Q. Is that the best reason that you have for it? A. That is one reason I had for it.

Q. If you kept a copy of it in your diary, have you any reason why you burned the original? A. I burned it up and thought I would forget that I ever had received it.

Q. If you thought you would forget that you ever received it, why did you copy it in your diary? A. Because I do a great many things that I have no reason for."

Mrs. Carpenter, in her diary, and on "Sunday, December 2," (3) 1882, wrote the following, among other things:

"Yesterday Mrs. Fuller called, and stayed about two hours, and opened up her budget of news, and told me that Colonel, my husband, had spent Thanksgiving afternoon up at Mitchell's. Oh, my God, how I felt! I wanted to put her out; to run off and leave her—everything to get by myself, and not let anyone see me."

On "Tuesday, December 18," (19) 1882, Mrs. Carpenter wrote the following, among other things, in her diary:

"I did make up my mind, if Colonel did not go near the Mitchells, that I would never say a word against them; but he does go. I somehow think he was there yesterday afternoon, as the office was closed when I passed, and I now intend to be as mean and spiteful towards her as I want to be, and let people know I don't visit her and don't intend to. I shall call on Mrs. Fuller, just for news, and cultivate her acquaintance just for that purpose—a person I would never visit if we lived in Pittsburgh."

On Wednesday, December 20, 1882, Mrs. Carpenter wrote the following, among other things, in her diary:

"Was out all yesterday afternoon, and got lots of information, but oh, heavens, of what a kind! To think we are the subjects of gossip and wonder all over this town! It is maddening to think of it, and I cannot endure it much longer. . . . Well, in the mail which she [Jennie Gwinn] brought off the porch, was a paper for McKay, and another horrid anonymous letter."

It will be remembered that it was also on December 20, 1882, that Mrs. Carpenter sent to Col. Carpenter's office for Mr. Feagan; and it was also at this time that Mr. Feagan read the third anonymous letter which Mrs. Carpenter said she had received. At the time that Mrs. Carpenter sent for Mr. Feagan, Col. Carpenter was not in his office, nor in Leavenworth, but was at Olathe, Kansas. This was just ten days after Col. Carpenter had received the anonymous letter ad-

47 — 30 KAS.

dressed to "Mrs. Col. J. C. Carpenter, Leavenworth, Kansas." It was eight days after he received the anonymous letter addressed to "J. N. Mitchell, Leavenworth, Kansas." It was either the same day or the next day after the anonymous letters were received by the editors of the Leavenworth *Daily Times* and the Leavenworth *Daily Standard;* and it was just the day before the second letter was received addressed to Mr. Mitchell.

The theory of counsel for defendant in error, plaintiff below, is, that Mrs. Carpenter was the author of all these anonymous letters, and had sent the same, and, not hearing from the one addressed to herself, nor from the one addressed to J. N. Mitchell, nor from those sent to the editors of the Leavenworth papers, she became exceedingly anxious, and her anxiety could not be appeased until she sent for Mr. Feagan to ascertain whether either of these letters had been received in Col. Carpenter's office or not; and knowing that she herself was the author of the letters, was the reason why she twice requested the return of her note sent to Feagan, and the reason why she enjoined such absolute silence and secresy upon the part of Feagan. Mr. Feagan states in his testimony that he told Mrs. Carpenter that he thought he ought to inform Col. Carpenter with reference to this matter, but Mrs. Carpenter requested him not to do so, and he promised that he would not. Mr. Feagan also testified that there was a stamp on the envelope which inclosed the anonymous letter which he read at Col. Carpenter's house, and that it seemed to have been canceled; but that there was no postmark. He says that the stamp appeared to be a stamp which had previously been used, and that it did not stick well to the envelope.

Colonel Carpenter, in his testimony at the trial, stated, among other things, that on Wednesday evening, December 27, 1882, the following conversation occurred between himself and his wife:

"She said: 'I want a peaceable separation;' and I said: 'All right;' and we agreed that it should be such. During

that evening I said: 'Lyde, your letters commenced with me anonymous and they closed anonymous;' and she said: 'Yes, but the first were a great deal more pleasant than the last;' and I said: 'Yes.'"

On the next evening the following conversation occurred between the parties:

"We sat and talked, as I say, over the separation; she asked me the question whether I was going to get a divorce; and in the conversation I said: 'Lyde, what, in Heaven's name, what possessed you to send those anonymous letters?' and she said: 'I wanted to break the friendship of you and the Mitchells;' and I said: 'And you were satisfied to sacrifice my well-being to do that?' and she made no response to that whatever."

Col. Carpenter also testified that on February 8 or 9, 1883, at the house of his brother, A. G. Carpenter, at Olathe, his wife again in substance admitted that she was the author of said anonymous letters. A portion of his testimony upon that subject is as follows:

"I then took out these communications with the envelopes on them, and said: 'Do you recognize this?' and she said 'Yes'; then I took them out one at a time and showed them to her, and she said she recognized them.

"Q. What, if anything, did she say as to whether she had told her mother of her sending these letters? A. She said she had told her so.

"Q. That she had told her so? A. She said she had told her of her sending the *letters*, and their contents."

Col. Carpenter at the time exhibited to his wife all the anonymous letters above quoted, and read all but one of them to her. A. G. Carpenter and Mrs. A. G. Carpenter were present at the time.

Mr. A. G. Carpenter, brother to Col. Carpenter, testified with reference to this same conversation, among other things, as follows:

"He was sitting close to her, and he put his hand in his inside pocket, and took out a large envelope, and took out of that envelope several letters, and he then held them up in front of her and says: 'Lyde, do you recognize these?' And

she said she did. She said she recognized the letters. He then separated them and held them all in one hand; he then separated them, and said: 'And this, and this, and this?' He went over two or three letters that way, and probably four, and she said she recognized them.

"Q. Go on and state all that was said between them? A. I have stated about all that I can recollect in relation to this matter—and then it passed on to these anonymous communications.

"Q. Then he pulled them out, and asked her if she could recognize them? A. Yes, sir."

Mrs. A. G. Carpenter testified with reference to this same conversation, among other things, as follows:

"Q. Now what was next said or done, if anything, with reference to some anonymous letters? A. About anonymous letters?

"Q. Yes. A. He put his hand in his side pocket and took out a large envelope, and took from that three or four smaller ones, and held them up to her and said: 'Lyde, do you recognize this?' And she said, 'Yes.'

"Q. She said, 'Yes'? A. Yes, sir, and I think he separated them and said like this: 'And this, and this, and this?'

"Q. What did she say? A. She said, 'Yes,' like that.

"Q. She said 'Yes,' to each one them, did she? A. I would not be positive that she said 'Yes' to each one of them.

"Q. Then what next was done with reference to the letters? A. He said: 'For the enlightenment of the folks here I will read them.' And he took out two of them and read them; but one he said he would not read.

"Q. Why did he say that he would not read it? A. He said that it was too obscene to read in my presence.

"Q. What next was said about those letters just after he had got through reading two of them? A. I think he read another one.

"Q. Well, then, what was said with reference to the letters, if anything? A. He said: 'Lyde, did you go home and tell your mother the whole story? Did you tell her all the trouble between you and me?' and she said: 'Yes.' He said: 'Did you tell her about sending these anonymous communications?' and she said: 'Yes.' And he said: 'Did you tell her the contents?' and she said: 'Yes.' Then he said: 'Then I say she is a queer woman to write me the letter she did.'

"Q. When he took the letters out and showed them to her,

he asked her whether she recognized those letters, did he?
A. Yes, sir.

"Q. Did he ask her whether she recognized or knew them?
A. Did she recognize them.

"Q. Then he read some of them? A. Yes, sir.

"Q. Then he asked her whether she had told her mother all about these communications? A. Yes, sir; and she said she had told her mother all.

"Q. Did she say she had told her mother that she had sent those letters? A. He asked her if she had told her mother all about sending them, and she said she had.

"Q. Did he use the word 'sending,' or 'sent'? A. I think it was 'sending;' I am not positive, quite.

"Q. Might there not be a mistake about the word 'sent'? A. I think there was no mistake about it.

"Q. Then he said if she told her mother all about it? A. Yes, sir, and told her about the contents.

"Q. Then he thought it very strange that she should write him such a letter as she had? A. 'Queer' is the word he used—'a very queer woman.'"

Mrs. Carpenter, the defendant below, in her testimony, contradicts the foregoing testimony of Col. Carpenter, of A. G. Carpenter, and of Mrs. A. G. Carpenter. She says she never admitted that she was the author of the anonymous letters sent and received in November and December, 1882; and she further says that she was not the author of them and had no knowledge of their existence prior to the time when they were received. Mrs. Carpenter in her testimony, and also in her diary, said that at first she thought that Mr. Anthony was the author of these anonymous letters, because of a post-office fight, and because he was a bitter enemy of Col. Carpenter. In her answer to the petition of the plaintiff, which was sworn to and filed by her, she stated as follows: "She believes, and charges the fact to be, that they [the anonymous letters] were gotten up and sent by the procurement of the plaintiff himself for the purpose of making testimony against her [Mrs. Carpenter]." On the trial she admitted that she did not believe that either Col. Anthony or Col. Carpenter was the author of the anonymous letters, and she did not know who the author was. It does not ap-

pear that she ever attempted to ascertain who the author was. Now it cannot be supposed that any man of business was the author of these anonymous letters; for no man of business would be likely to take the time to cut words and letters from newspapers and paste them upon blank paper for the purpose of making several anonymous letters, where no conceivable benefit could be derived therefrom. Nor would any man of courage be likely to be the author of such letters; and indeed but few men would desire to engage in a secret and clandestine fight, and a fight that would tend to injure the character of a woman for chastity. The author of these letters most probably was some person who had a great deal of leisure; a person who had a room not often visited by others; a person who felt, for some reason, that he or she could not afford to make an open and bold fight; a person who believed that he or she had been greatly wronged by Col. Carpenter, or by the Mitchells, or by both; and a person who cared but little for the destruction of Mrs. Mitchell's character for chastity. Now this description of the person who was probably the author of these anonymous letters would apply precisely to Mrs. Carpenter, and it would not apply to any other person, so far as the evidence in the case shows. Besides, Mrs. Carpenter had previously had experience in sending anonymous communications. There was no evidence in the case tending to cast even suspicion upon any other person. Now, taking the whole of the evidence together, we think it amply sustains the finding of the court below that Mrs. Carpenter was the author of these anonymous letters. We might here state, before passing to the next question, that the weight of Mrs. Carpenter's testimony was considerably lessened by the fact of her making statements in her answer filed to the plaintiff's petition (which answer was sworn to by her), and making statements in her diary and elsewhere, which were not true, and which even her own testimony on the trial showed were not true.

The next question to be considered is, whether the facts as found by the trial court and as proved on the trial constitute

extreme cruelty on the part of the defendant below toward the plaintiff below. We think they do. In the first place, the evidence shows that the plaintiff, prior to his marriage and since, has been a man of some pretensions as to character, integrity, and ability. He was (and we suppose still is) a member of the Methodist Episcopal church, and professed to be an honest and faithful christian; and he had high aspirations for political preferment. He was then holding the office of collector of internal revenue for the district of Kansas, and had twice before been a candidate for the office of governor of the state, though he was defeated in his own party for the nomination. In November and December, 1882, his wife kept a diary, in which she recorded many things derogatory to his character, and cruelly unjust to him. She sought for scandal affecting his moral standing; and then, to humiliate him in his own estimation, and to disgrace him in the opinion of all good people, sent cruel, anonymous letters to editors of newspapers known by her to be his personal or political enemies, with the expectation that these editors would publicly accuse him in their journals of immoral conduct, of which she herself did not believe him guilty, and of which she had no good reason to even suspect that he was guilty. She also sent to one of the clerks in his office similar anonymous letters falsely charging her husband with criminal intimacy with the wife of such clerk. Also, in the absence of her husband, she invited another clerk in his office to a secret interview with herself, and there poured forth her grievances, and exhibited to such clerk another of such anonymous letters, obscene in its character, and containing similar false charges against her husband. And after their separation, she wrote to her husband an insulting letter, falsely charging him with meanness and gross misconduct unbecoming a gentleman; and finally filed an answer in this case falsely accusing him of many things which she at no time believed, and at no time even attempted to prove.

The legal question that arises upon these facts is, whether they constitute "extreme cruelty," or not, within the mean-

ing of the divorce statute. It was formerly thought that to constitute extreme cruelty, such as would authorize the granting of a divorce, physical violence is necessary; but the modern and better-considered cases have repudiated this doctrine as taking too low and sensual a view of the marriage relation, and it is now very generally held that any unjustifiable conduct on the part of either the husband or the wife, which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other as to seriously impair the bodily health or endanger the life of the other, or such as in any other manner endangers the life of the other, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes "extreme cruelty" under the statutes, although no physical or personal violence may be inflicted, or even threatened. (*Gibbs v. Gibbs*, 18 Kas. 419; *Bennett v. Bennett*, 24 Mich. 482; *Goodman v. Goodman*, 26 id. 417; *Palmer v. Palmer*, 45 id. 151; *Whitmore v. Whitmore*, 49 id. 417; *Caruthers v. Caruthers*, 13 Iowa, 266; *Wheeler v. Wheeler*, 52 id. 511; *Powelson v. Powelson*, 22 Cal. 358, 361; *Smith v. Smith*, 8 Oregon, 100; *Kennedy v. Kennedy*, 73 N. Y. 369.; *Latham v. Latham*, 30 Gratt. 307; *Black v. Black*, 30 N. J. Eq. 215, 221; *Cook v. Cook*, 3 Stock. [N. J.] 195; *Beyer v. Beyer*, 50 Wis. 254; *May v. May*, 62 Pa. St. 206; *Beebe v. Beebe*, 10 Iowa, 133.)

None of the foregoing cases are precisely like the present case, but many of them sustain the principle above enunciated; and taken together, they clearly show the tendency of modern thought upon this subject. The tendency of modern thought is to elevate the marriage relation and place it upon a higher plane, and to consider it a mental and spiritual relation as well as a physical relation. In the present case the conduct on the part of the defendant below was not only such as would tend to wound the feelings of the plaintiff below, and to destroy his peace and happiness, and to impair his bodily health, but it was also such as would tend to put his life in danger. The legitimate result of the conduct on the part of the defendant below in sending the anonymous letters

to Col. Carpenter's clerk, Mr. J. N. Mitchell, and in endeavoring in other ways to give currency to the charges that a criminal intimacy existed between Col. Carpenter and the clerk's wife, would naturally be to cause the clerk, if he believed the insinuations of criminal intimacy between Col. Carpenter and his wife, to take the utmost vengeance upon Col. Carpenter. And the repetitions of these charges by sending anonymous letters to newspaper editors with their intended publication in the Leavenworth newspapers, was naturally calculated to induce the clerk to believe that the charges were true, and to cause him to assault the supposed invader of his home and marital rights. Experience and observation fully demonstrate that this is the natural order of things. Mrs. Carpenter's conduct was well calculated to put Col. Carpenter's life in jeopardy.

Such conduct would also naturally tend to destroy his reputation and influence as a politician and officer, and to deprive him of his office and means of subsistence, and to utterly destroy his happiness and peace of mind. And mental suffering may be much greater than physical suffering. And the treatment Col. Carpenter received from his wife must have caused him intense suffering, great anguish of mind and spirit, and inexpressible sorrow. According to his own testimony, his grief was literally overwhelming.

It is our opinion, not only upon the authorities, but also as an independent proposition, that the conduct of Mrs. Carpenter toward her husband amounted to extreme cruelty within the meaning of the divorce statutes, and therefore that Colonel Carpenter is entitled to the divorce prayed for in this action, and granted to him by the court below. Of course many of the wrongs committed by Mrs. Carpenter would not, if taken separately, amount to extreme cruelty, or authorize the granting of a divorce. The recording of the false accusations in her diary would not; the sending of the insulting letter to Colonel Carpenter after their separation would not; or the filing of the answer in the present case, with its unjust charges, would not; but these, with all the

other wrongs committed by her, when taken in the aggregate, do amount to extreme cruelty, and are sufficient to authorize the granting of the divorce. Indeed, we think the sending of the anonymous letters to the clerk of Colonel Carpenter, (J. N. Mitchell,) with her other acts, naturally tending to induce Mitchell to believe that a criminal intimacy existed between Colonel Carpenter and Mrs. Mitchell, are of themselves sufficient to constitute extreme cruelty, and to authorize the granting of the divorce; for these acts, as before stated, naturally tended among other things to put Colonel Carpenter's life in jeopardy.

The plaintiff in error, defendant below, complains that the court below erred in rendering judgment for costs. Now the court below imposed all the costs of the case upon the defendant in error, plaintiff below, except one-half of the stenographer's fees, and the costs made by the defendant below in taking certain depositions which were not used on the trial; and no judgment was rendered for these excepted costs. We do not think that the court below erred as against the plaintiff in error, defendant below, with respect to costs.

Perceiving no material error in this case, the judgment of the court below will be affirmed.

All the Justices concurring.